UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| MCKINNEY HOUSING AUTHORITY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. ___4:25-cv-467___ |
| | § | |
| PROVIDENCE HOMEOWNERS | § | JURY TRIAL DEMANDED |
| ASSOCIATION, INC. and FIRSTSERVICE | § | |
| RESIDENTIAL TEXAS, INC., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

Plaintiff McKinney Housing Authority ("MHA"), by and through the undersigned counsel, hereby files this Complaint against Defendants Providence Homeowners Association, Inc. ("PHOA") and FirstService Residential Texas, Inc. ("FirstService") and allege as follows.

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   PARTIES ............................................................................................................. 3

III.  JURISDICTION AND VENUE ......................................................................... 3

IV.  FACTUAL BACKGROUND .............................................................................. 4

    A.     MHA and the Housing Choice Voucher Program ................................ 4

    B.     Providence Village: Governance and Demographics ........................... 5

    C.     Lead-up to the Enactment of the Rules ............................................... 7

    D.    Restriction on HCV Program .............................................................. 9

    E.     Enactment of the Rules ...................................................................... 10

    F.     Aftermath of the Enactment of the Rules .......................................... 14

    G.    Texas Outlaws the Rules and the Board Tries Again .......................... 14

    H.    Intimidation and Harassment Throughout the Process ........................ 16

    I.     MHA has suffered and continues to suffer harm ................................ 17

V.    CAUSES OF ACTION ..................................................................................... 18

    COUNT ONE: Violation of Subsections 804(a) & 804(b) of the FHA ............................18

    COUNT TWO: Violation of Subsection 818 of the FHA ................................19

    COUNT THREE: The Rules banning program participants caused a disparate impact on black program participants...................................................................20

    COUNT FOUR: Permanent Injunctive Relief...................................................21

VI.  JURY DEMAND .............................................................................................. 23

VII. CONCLUSION AND REQUEST FOR RELIEF ........................................... 23

## I.    INTRODUCTION

1.      This is an action for economic damages, declaratory and injunctive relief, and attorneys' fees arising from violations of the Fair Housing Act, 42 U.S.C. §§ 3601–3619 (the "FHA"), brought by MHA as an aggrieved party that has suffered injury fairly traceable to Defendants' actions in the Providence Village community in Texas. Defendants' discriminatory actions forced MHA to incur increased staff time costs, increased rental support, attorneys' fees, relocation costs, and other costs. MHA has also suffered noneconomic injury from the defeat of its mission to serve the housing needs of low to moderate-income families to 1) increase the availability of decent, safe, and affordable housing in its communities; 2) ensure equal opportunity in housing; 3) enhance self-sufficiency; 4) promote community quality of life; and 5) economic viability.

2.      Defendants PHOA and FirstService, acting in concert with their agents, engaged in a sustained campaign of discrimination on the basis of race, color, and sex through the adoption and enforcement of residential leasing rules that effectively excluded MHA tenants from participating in the Housing Choice Voucher program ("HCV Program" and "Program Participants"), all of whom are Black women. These actions were taken with knowledge of their discriminatory impact, amidst widespread racially charged rhetoric in community forums, and in violation of MHA's rights under federal housing law. MHA further alleges that Defendants failed to take corrective action in the face of ongoing harassment and intimidation targeting protected classes.

3.      On January 14, 2025, the Secretary of the U.S. Department of Housing and Urban Development ("HUD") issued a Charge of Discrimination against PHOA, FirstService, Jennifer Dautrich, and Cody Watson regarding 53 administrative FHA Complaints filed with HUD. In this

Charge, the HUD Secretary determined that reasonable cause exists to believe that discriminatory housing practices have occurred because of race in violation of the FHA and authorized and directed the issuance of the Charge.[1]

4.      The 53 HUD Complaints were brought by Program Participants, owners of PHOA property who rented homes to Program Participants, MHA, Denton Housing Authority, and PHOA residents who opposed the ban on renting to Program Participants and rental restrictions. These Complaints alleged that the PHOA, FirstService, PHOA Board President Ms. Dautrich, and property manager Mr. Watson discriminated because of color or race in violation of the FHA through the enactment and enforcement of rental rules that prohibited homeowners from renting to tenants who receive assistance through the federally subsidized HCV Program (formerly known as and sometimes derogatorily referred to as "Section 8").

5.      The FHA mandates that any resolution of HUD's Charge shall require the consent of the aggrieved persons, including MHA, on whose behalf the Charge is issued. 42 U.S.C. § 3612(e).

6.      MHA and its undersigned outside counsel received the Charge of Discrimination on January 14, 2025.

7.      After HUD issued the Charge, one or more parties filed a Notice of Election to Proceed in Federal Court. Pursuant to 42 U.S.C. § 3612(o)(1), the FHA mandates that the U.S. Attorney General commence and maintain a lawsuit on behalf of the aggrieved parties in a United States District Court within 30 days after the election. Despite this statutory mandate, the U.S. Attorney General did not file suit. On Friday, February 21, 2025, HUD's Office of General Counsel withdrew the referral of the above-captioned case to the Department of Justice.

---

[1] The Redacted HUD Notice and Charge of Discrimination (Charge) and Determination of Reasonable Cause (Determination) is Exhibit 1 to this Complaint and incorporated herein by reference.

8.      If the U.S. Attorney General of the Department of Justice had prosecuted (or in the future prosecutes) the lawsuit pursuant to the Charge, the FHA requires that the Attorney General prosecute the case at no cost to the aggrieved persons. 42 U.S.C. § 3612(o)(1); Ex. 1 at 3 (pdf).

## II.      PARTIES

9.      Plaintiff McKinney Housing Authority is a Texas municipal housing authority created by the City of McKinney under Texas Local Government Code § 392.011 to address the need for a housing. MHA is also an administrator of funds from HUD under 42 U.S.C. § 1437(g). MHA's principal place of business is located in Collin County, Texas. MHA's programs and activities include housing counseling and referrals for individuals to housing providers.

10.     MHA meets the definition of "aggrieved persons" within the FHA. 42 U.S.C. § 3602(i).

11.     Defendant Providence Homeowners Association, Inc. is a Texas nonprofit corporation that has its principal place of business in Dallas, Texas and may be served with process through its registered agent, FirstService Residential Texas, Inc., at 14951 North Dallas Parkway, Suite 600, Dallas, Texas.

12.     Defendant FirstService Residential Texas, Inc. is a Texas for-profit corporation that has its principal place of business in Dallas, Texas and may be served with process through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## III.      JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331(a), which gives district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." This case presents federal questions because PHOA, the president of its board, Ms. Dautrich, its property management company, FirstService, and/or its property

manager, Mr. Watson, discriminated against MHA Program Participants because of race, color, and sex in violation of the FHA, 42 U.S.C. § 3601, *et seq*. Notably, MHA Program Participants Sheilla Nathan and Alonzo Tutson are named plaintiffs in a related filed lawsuit captioned *Dewanna Johnson, et al. v. Providence Homeowners Association, et al.*, Case No. 4:25-cv-00418, currently pending in this court and district before Judge Amos Mazzant.

14.    MHA has standing under 42 U.S.C. § 3613 because, even without a Charge of Discrimination, it is an aggrieved party that has been directly or indirectly injured by Defendants' unlawful actions and may file a private lawsuit under the FHA, without regards to whether or not the U.S. Attorney General files suit pursuant to 42 U.S.C. § 3613(a). MHA has incurred out of pocket losses, suffered impairment to its core activity of placing people in homes, and suffered impairment to its mission to serve the housing needs of low to moderate income families.

15.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Specifically, the alleged unlawful housing practices were committed in this district.

## IV.    FACTUAL BACKGROUND

### A.    MHA and the Housing Choice Voucher Program

16.    MHA's mission is to serve the housing needs of low to moderate-income families in order to 1) increase the availability of decent, safe, and affordable housing in its communities; 2) ensure equal opportunity in housing; 3) enhance self-sufficiency; 4) promote community quality of life; and 5) economic viability.

17.    MHA is a municipal housing authority created by the City of McKinney ("Mckinney") under Texas Local Government Code § 392.011 to address the need for a housing authority because there was either (1) unsanitary or unsafe inhabited housing in McKinney or (2) a shortage of safe or sanitary housing in McKinney available to persons of low income at rentals

that they can afford.

18.    Under Texas Local Government Code § 392.031, the City appoints MHA's Board of Commissioners, but MHA operates as a separate legal entity authorized to conduct its own business.

19.    MHA is also an administrator of funds from HUD for the HCV Program, which includes Section 8, the Veterans Affairs Supportive Housing Program, and the Mainstream Vouchers Program. Under the HCV Program, HUD pays rental subsidies so that eligible families can afford decent, safe, and sanitary housing. HUD provides MHA with housing assistance funds and funds for administration of the program.

20.    Families select and rent units that meet certain Program Housing Quality Standards. If MHA approves a family's unit and tenancy, it contracts with the owner to make rent subsidy payments on behalf of the family.

21.    Subsidy in the HCV Program is based on a local "payment standard" that reflects the cost to lease a unit in the local housing market. The family generally pays 30 percent of adjusted monthly income for its portion of the rent.

22.    Around the time of the events described herein, MHA had three Program Participating families living in Providence Village in the area covered by the PHOA. All of the Program Participants were Black, with female Head of Households.

23.    MHA originally received notice of PHOA's actions from one of its HCV Program Participants.

**B.    Providence Village: Governance and Demographics**

24.    The town of Providence Village, an outer-ring suburb of Dallas, Texas, contains five homeowners' associations, including Defendant PHOA, whose area encompasses over 2,250 houses. Ex. 1 at 26.

5

25.     The PHOA contracts with FirstService for property management services. Ex. 1 at 26.

26.     The PHOA is run by a Board of Directors in accordance with three governing documents: the Articles of Incorporation, the Bylaws of Providence Homeowners Association, Inc., and the Declaration of Covenants, Conditions, & Restrictions ("Declaration"). Ms. Dautrich became PHOA Board President on April 7, 2022. She had been an active Board member since 2019, serving first as Treasurer and then Vice President. Ex. 1 at 26.

27.     The Declaration gives the PHOA authority for the overall development, administration, maintenance and preservation of the homes and property in PHOA. The Declaration and PHOA Rules are binding on anyone having any right, title, or interest in the PHOA properties and runs with the title to the property.

28.     PHOA exercises significant power over the properties in its jurisdiction, including enforcing rules and collection fees. These PHOA powers have governmental qualities.

29.     PHOA is also associated with several social media groups that frequently feature explicitly racist and threatening posts, including those targeting Program Participants. Members of the PHOA Board are active participants in these groups and engage with such content. Ex. 1 at 26.

30.     These social media groups often contained explicitly racist and threatening posts. For example, one post included a photo of a Black man altered to have a rope around his neck, with the caption "This one is not coming back tomorrow." In another post, someone wrote "Borrow a paintball gun. Light them asses up with a florescent yellow paint ball. It would contrast nice with their dark skin." Ex. 1 at 26.

31.     In recent years, the community has grown more diverse, with the share of white homeowners falling from 92% in 2018 to 77% in 2022. As of 2022, PHOA's covered area had households that were 74% White and 14% Black, its households were 66% owners and 34%

renters, and 4% of households used HCVs. Ex. 1 at 26-27.

32.     As of 2021, only 4% of households covered by the PHOA were Program Participants, and 93% of those Program Participants households were Black. Ex. 1 at 18. HUD data further shows that the overwhelming majority of these Program Participant households were led by women—94% in 2022 and 95% in 2023. The majority of renters in Providence Village are non-voucher tenants, most of whom are White and non-Hispanic. According to 2022 U.S. Census data, there were over 400 White non-Hispanic renters in Providence Village. The data also reflects a broader trend in household composition: as of 2023–2025, there were 646 family households in the community, including 237 female-headed renter households and only 17 male-headed renter households. These figures illustrate the racial and gender demographics of the renter population in Providence Village, highlighting a small but disproportionately targeted group of Program Participants within a predominantly White rental population.

33.     Around July 2021, after an altercation between a Black teenager and a White teenager, some residents began attributing crime and other issues in the community to Program Participants, often using racially charged language such as "ghetto." Despite lacking any evidence that Program Participants were responsible for criminal activity, PHOA Board members continued to publicly blame them on social media. Ex. 1 at 27.

**C.    Lead-up to the Enactment of the Rules**

34.     Around 2018, the PHOA Board of Directors began discussing their perception that the number of rental units in their community was growing and that this was causing problems. What was, in fact, increasing in the Town during this time was the number and concentration of Black residents. Ex. 1 at 27.

35.     Around July 2021, Board members and other homeowners in the Town began focusing their concerns specifically on Program Participants, even though they continued to

comprise an extremely small percentage of the neighborhood's population. Ex. 1 at 27.

36.     By Fall 2021, community conversations shifted to include homeowner requests for the Board to restrict rentals available to Program Participants. This prompted a social media debate among residents and officials about the legality of such restrictions. The mayor noted that a nearby Savannah HOA, also managed by FirstService, faced and lost nine lawsuits over a similar attempt, citing fair housing laws. Ms. Dautrich confirmed the Board had consulted legal counsel and concluded no restrictions could be imposed. Over the following weeks, she expressed frustration, stating their zip code had become "a hub for Section 8" and that "only so many should be allowed in any neighborhood." Despite acknowledging legal limitations, she added, "I still fight it." Ex. 1 at 26-27.

37.     Residents of the Town provided their views to the Board on these efforts, often by tagging them in posts on social media. For example, one owner tagged Ms. Dautrich in a post that said the following:

> "I think the main things is just to be careful how you word it in the bylaws … it can't come off as being discrimination against protected classes (race, sex, etc.). It's usually easier to put bylaws with restrictions on rentals (number allowed per investor, total % of the neighborhood, etc.) which then results in fewer section 8 types/fewer rentals overall." Ex. 1 at 28.

38.     For several months during 2021, Mr. Watson, the FirstService employee who was the property manager for PHOA, and the PHOA Board worked together to draft the Rental and Leasing Rules (the "Rules"). The Rules prohibited owners from renting to Program Participants, and imposed other restrictions on rental housing, such as allowing only one rental per property owner. Mr. Watson and the Board acted despite initially being told by the mayor and others that such restrictions might violate fair housing laws. Ex. 1 at 28.

39.     The Rules were based on those from Savannah, and Mr. Watson exchanged over ten drafts with the Board during this process. Mr. Watson flagged that restrictions on Program Participants would be a challenge to enforce because PHOA and FirstService did not track rentals,

let alone which tenants used vouchers, but the Board dismissed these concerns. Ex. 1 at 28.

40.     The Rules provided that no rental home could be publicly financed or subsidized. They also prohibited short term rentals, limited owners to one rental property, and required owners to live in the home for a period of time before renting it out. The Rules stated that owners could be charged hundreds of dollars per week for failing to comply. Ex. 1 at 28.

41.     At the time, the Board's governing documents did not give it the authority to directly enact rental restrictions. Instead, a majority of property owners would need to vote in favor of adding such restrictions to the Declaration for them to take effect. The Board had attempted to amend the Declaration by majority vote many times in the past; some of these attempts had succeeded while others had failed. Ex. 1 at 28.

42.     On November 30, 2021, Ms. Jennifer Dautrich, proposed amending PHOA's governing documents to give the Board the authority "to adopt rules for the rental, leasing, and tenant occupancy" (the "Amendment") instead of conducting a vote on the Rules themselves. Ex. 1 at 28-29.

43.     In support of her proposal, Ms. Dautrich discussed property maintenance and crime in the general area, but she did not provide data that was specific to PHOA or that connected any such issues to Program Participants, nor was such data presented at any of the Board's meetings in the months that followed, presumptively because it did not exist at the relevant time (or ever). As another Board member wrote on social media a few months later "no I don't have statistics, I use my common sense and what I have seen transpire in the neighborhood." Ex. 1 at 29.

**D.     Restriction on HCV Program**

44.     One of the reasons that people are moving into higher opportunity areas such as Providence Village is to allow their children to have access to better education, which helps in decreasing the amount of generational dependency on public assistance. The process of applying

for, determining eligibility, and issuing a voucher to an individual, requires time on a waiting list first. Depending on available funding, MHA sends notices to all individuals on the waiting list based on the date and time of application receipt. At times, MHA may have preferences such as elderly or disabled, but generally, date and time is the preference.

45.    When MHA processes the vouchers, they ask applicants to provide information such as their income, income of all members of the household, birth certificates, social security numbers, etc. MHA also utilizes HUD's recalculation process to determine whether or not the family meets the income requirements.

46.    Additionally, MHA conducts a criminal background check. The HCV Program prohibits MHA from giving vouchers to tenants for violent or drug-related activity or other criminal activity which may threaten the health, safety or right to peaceful enjoyment of the premises. 24 C.F.R. § 982.553 (titled "Denial of admission and termination of assistance for criminals and alcohol abusers."). Program Participants will lose their voucher if engaged in such criminal activity. None of MHA's Program Participants living in the area covered by PHOA have such criminal convictions and they have maintained eligibility for their vouchers.

47.    An individual would be ineligible or barred, if their criminal background shows, among other crimes, a "lifetime sex offender registration" or for having been terminated from public housing for producing methamphetamine.

**E.    Enactment of the Rules**

48.    Voting for the Amendment opened on February 7, 2022, with 1127 votes needed for the Amendment to pass. The Board planned to hold the vote open until enough votes were received for the Amendment to pass. The Board had not done this for prior amendments. Ex. 1 at 29.

49.    Over the following week, dozens of residents emailed the Board about the Amendment, including many who had questions about what rules specifically the Board wanted

the authority to enact. One asked if owners would get to see the text of the actual rules "like previous voting cycles have done." Ex. 1 at 29.

50.    In response to these inquiries, on February 15, 2022, FirstService featured the proposed Amendment in the weekly email newsletter that it sends out to PHOA residents. The newsletter included a "Q&A" about the Amendment and a link to a draft of the rules that the Board wanted to enact if given the authority. The Q&A highlighted that "the rules would prohibit any future Section 8 leases" but made clear that "No lease, Section 8 or otherwise, will be terminated immediately. All current leases will be honored without penalty." The full Q&A was included at least a dozen more times in FirstService's weekly newsletter. Ex. 1 at 29.

51.    In the weeks that followed, landlords with rental properties in Providence Village reached out to the Board objecting to the ban on Program Participants and the other proposed rental rules. The landlords asked that if crime or maintenance issues were truly the concern that the Board provide them with additional details so they could address any specific problems. The Board never responded to these requests. Ex. 1 at 29.

52.    While voting was ongoing, posts about Program Participants in the PHOA social media groups were rampant with racial posts. For example, one post showed the mug shots and arrest record for a Black man, who the poster presumed was a Program Participant, with the caption "Damn this ghetto ass neighborhood is on a roll!!! Hide Your kids cause section 8 is on the loose!!!" The post garnered about 100 comments, many of them using extreme language in talking about Program Participants, such as one referring to the man as a "the dumb ass sec 8 pos" and another referencing "ghetto trashy areas that are full of pos renters and section 8." Ms. Dautrich joined the comments on this post to promote the Amendment. Ex. 1 at 29-30.

53.    By April 2022, it had become clear that not enough owners were voting to reach a

majority, so Ms. Dautrich organized a group of twenty-three homeowners – including a current and a former PHOA Board member – to form an Amendment Committee to actively campaign for the Amendment by going door-to-door collecting ballots and trying to persuade owners to vote for the Amendment. Ex. 1 at 30.

54.     Throughout this time, FirstService and the Board inundated owners with reminders about the Amendment, first weekly and later daily. Board and Committee members also promoted the Rules heavily on social media. Ex. 1 at 30.

55.     No prior amendment efforts, even those that failed to gain traction, prompted the formation of a special committee, a coordinated canvassing campaign, or this level of promotion by FirstService or the Board. Ex. 1 at 30.

56.     By May 2022, these efforts had proven effective, and the Amendment passed. On May 18, 2022, the Board announced that owners' last chance to vote on the Amendment would be at a special open Board meeting two weeks later. In the meantime, however, the Amendment received enough votes to pass, so Mr. Watson closed voting in the online system. Ex. 1 at 30.

57.     On June 6, 2022, the Board held another open meeting. Ms. Dautrich read out a revised version of the Rules, which the Board then voted unanimously to approve using its new authority. Ex. 1 at 31.

58.     On June 8, 2022, several residents who opposed the Amendment gathered in a park by a lake to discuss the vote. An Amendment Committee member photographed the group, which included children, without their knowledge and another resident posted the photograph to social media with the caption "Here's a great pic depicting the very Fucking Idiots that help to Ruin our lovely town of Providence Village!!" Ex. 1 at 31.

59.     On June 14, 2022, the Rules were finalized and officially recorded. Ex. 1 at 31.

60.     Despite earlier pledges not to displace residents immediately, the Rules as enacted did not preclude this. The Board announced that enforcement would begin in ninety days, and Mr. Watson told some residents it would begin in as little as thirty days. Ex. 1 at 31.

61.     The Rules contained a "Section 8 Rent Restriction" governing the leasing of homes in PHOA that stated:

> **Section 8 Housing Restriction.** A Rent House may not be used for a publicly financed or subsidized housing program, such as Section 8 Housing.

62.     The Rules also contained other rental restrictions on PHOA owners for leasing homes in PHOA including:

> **One Rent House Limit.** A person may only own one Rent house in the Subdivision at a time. "Rent House" means an occupied house that is (x) not an Owner-Occupied Home, or (y) a house that has been vacant for three (3) or more months. "Owner Occupied Home" means a house in which at least one occupant is an Owner or Owner's spouse or is related to an Owner or Owner's spouse by blood, marriage, adoption, or formal guardianship, and for which occupants do not pay rent….

> **Initial Owner Occupancy Term.** An Owner must reside in the home for the first twenty-four (24) consecutive months after acquiring an ownership interest in the home before the Owner may rent or lease the home pursuant to these Lease Rules.

63.     The Leasing Rules were later revised to set fines of $200 per week for an owner's failure to register the rental with the PHOA and $200 per week for "Unauthorized Rental."

64.     The Rules did not set out any procedure for the owner to follow to end a violation of the Section 8 Housing Restriction. The PHOA's governing Declaration provides that if the owner does not cure the violation, the PHOA may take enforcement action and impose fines in accordance with applicable law. The Rules specifically provide that the PHOA itself may take enforcement action against violations of the Rules without incurring any liability to the owner: "for any damages, including lost rents, suffered by the Owner in relation to the Association's enforcement of the Documents against the Owner's tenant." The governing Declaration gives the

PHOA the ability to use self-help to remove any "person . . . that violates the Declaration or other governing documents." The self-help includes "force as may reasonably be necessary…."

65.     The PHOA Rules apply to all of the PHOA homes under the governing PHOA covenants.

### F.     Aftermath of the Enactment of the Rules

66.     The enacted Rules set off an immediate wave of panic among owners and tenants. Immediately, owners told their HCV tenants that to avoid substantial fines levied by PHOA, tenants had to vacate their units within thirty days, leading to frantic searches for alternative housing. Ex. 1 at 32.

67.     Then, on August 5, 2022, PHOA entered into an agreement with HUD staying enforcement of the Rules ("Stay"). Ex. 1 at 32. However, Program Participants began leaving their homes due to the uncertainty around this time. MHA's Program Participants were told by their landlords that they needed to immediately leave their homes prior to the expiration of their leases. In the wake of the Rules' passage, two Program Participating families moved away from Providence Village, while the one that remains continues to live in fear. One of MHA's Program Participants moved out in June 2022 but did not secure replacement housing until September 2022.

### G.     Texas Outlaws the Rules and the Board Tries Again

68.     On June 18, 2023, one year after Providence Village enacted the Rules, Texas passed Texas Property Code § 202.024(b), which states:

> (b) A property owners' association may not include or enforce a provision in a dedicatory instrument that prohibits or restricts a property owner from renting a dwelling to a person based on the person's method of payment.

69.     The statute further defines "method of payment" as:

> (1) a housing choice voucher under Section 8, United States Housing Act of 1937 (42 U.S.C. Section 1437f); or

(2) any other federal or state or local housing assistance provided to a person or to a property owner on behalf of a person, including rental vouchers, rental assistance, or rental subsidies from a non-governmental organization.

70.    The law became effective on September 1, 2023.

71.    In response to the new law, the PHOA Board sent out a letter stating that they "will continue to fight for you by searching for alternative ways to ensure the integrity of our neighborhood." Ms. Dautrich reiterated on social media "we didn't lose.… The board is continuing to fight this." Ex. 1 at 33.

72.    On June 26, 2023, the PHOA Board adopted a resolution to amend the Leasing rules by removing all references to Section 8 Housing and adopting the Amended and Restated Leasing Rules.

73.    During the summer and fall of 2023, racial tensions in Providence Village related to Program Participants continued to build. In July and November, the National Justice Party, a White nationalist organization protested just outside Providence Village with fliers that said, "an overwhelming majority of section 8 recipients are composed of Black Americans" who bring "unimaginable violence." In July they also left flyers at people's homes that said, "The federal government views safe White communities as a problem. The Section 8 Housing Voucher is a tool used to bring diversity to these neighborhoods.… Blacks bring crime and violence," and in November they left doorhangers that listed violent crimes supposedly committed by a Black "Section 8" renters. Ex. 1 at 33-34.

74.    In February 2024, the Board met with their state representative to discuss his ideas since he was in the process of forming a task force about the matter. Ex. 1 at 34.

75.    On May 10, 2024, the Board adopted the "Second Amended and Restated Rental and Leasing Rules," which limited owners to one rental property each. Because most Program Participants in Providence Village rented from a few large landlords who rented many units, this

rule would in practice have similar results as the prior outright ban. The new rules also limited the number of rental units to twenty-five percent of the lots in PHOA. Ex. 1 at 34.

76.     On July 30, 2024, the PHOA Board adopted the "Third Amended and Restated Rental and Leasing Rules." These new Leasing Rules continue the One Rent House Limit from the original June 2022 Rules and continue the initial owner occupancy rule from the June 2022 Rules requiring the owner to reside in the home for the first 24 months prior to leasing. The 25% Rental Cap enacted on May 10, 2024, remains in effect but has been expanded to require a PHOA Owner to get on the PHOA waiting list if you desire to lease your home.

**H.     Intimidation and Harassment Throughout the Process**

77.     From the lead up to the Rules' enactment through its aftermath, posts threatening Program Participants with racially coded language filled social media. For example, one post said, "Back in the day, when a community didn't like someone, they banned together to make said persons life a living hell to the point they left." Another resident threatened "they might just leave in a coroner's wagon!!" and "kids will get SHOT." Posts like these were also directed at residents who supported Program Participants and opposed Rules. Despite being well aware of such conduct, neither the PHOA Board nor FirstService ever did anything meaningful to address it. Ex. 1 at 33-34.

78.     Some posts were directed at female Program Participants. For example, one post said, "get your section 8 asses out of town now bitches [explosion emoji] and don't let the door hit you in your fat ass mouths!!" Ex. 1 at 34-35.

79.     In addition, Program Participants who were particularly vocal in opposing the Rules were targeted personally. Residents also directed aggressive and threatening posts at residents who supported Program Participants and opposed Rules. Ex. 1 at 35.

80.     Despite being well aware of these actions and the distress they were causing, neither the Board nor FirstService took any meaningful actions to address them. Board members actively

participated in the social media groups in which this content was posted. Several Board members admitted seeing aggressive comments in these groups, and Mr. Watson admitted having multiple discussions with Board members about them. Ex. 1 at 35.

81.     This inaction stands in contrast to actions that Mr. Watson and the Board took regarding more minor incidents. Mr. Watson mediated many disagreements between residents, such as issues with dogs barking, cars blocking driveways, blocking mailboxes, trespassing, and not mowing lawns, among others. He even called the police in certain instances, for example, in response to complaints of kids fighting. For its part, the Board often worked with Mr. Watson to resolve certain disputes, as they did for example in one over a fallen tree. Ex. 1 at 35.

## I.     MHA has suffered and continues to suffer harm

82.     MHA has incurred out of pocket losses, suffered impairment to its core activity of placing people in homes, and suffered impairment to its mission to serve the housing needs of low to moderate income families. As a result of the Rules, at least two of MHA's Program Participants were forced to move out of Providence Village, and all of them feared becoming homeless when faced with eviction threats. Upon information and belief, Program Participants were the only ones evicted under the Rules.

83.     MHA incurred significant costs due to these Rules, including the time and expense required to coordinate numerous relocations within a short period and to meet with Program Participants and landlords to explain the Rules and ensure compliance.

84.     As of July 27, 2023, MHA's costs related to these efforts totaled approximately $15,848.56, with an additional $3,447.57 incurred later. MHA also spent resources notifying clients, sending emails, and connecting them with legal aid clinics and other support services.

85.     In at least one case, MHA had to provide additional financial support after a client was forced to move due to PHOA-related issues, resulting in a rent increase from $1,495 to $2,906

— a rise of $500–$600 in monthly support.

86.    MHA, a small organization, dedicated approximately 160 staff hours to these matters — two employees each working about 80 additional hours. Their work included meetings with clients, travel, consultations with HUD and attorneys, and the creation of educational materials for tenants and landlords.

87.    MHA's core mission is to increase the availability of affordable housing, and Defendants' actions undermine this mission by reducing the supply of affordable housing units.

88.    As a result of Defendants' discriminatory conduct, MHA has suffered actual damages.

## V.    CAUSES OF ACTION

### COUNT ONE: VIOLATION OF SUBSECTIONS 804(A) & 804(B) OF THE FHA

89.    MHA re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90.    Defendants' policies and actions enacting the rules banning vouchers and the rental restrictions constitute discrimination on basis of race and color and violate the FHA, 42 U.S.C. § 3604(a), 24 C.F.R. § 100.50(b)(3), 24 C.F.R. § 100.70(d)(5), and 42 U.S.C. § 3604(b), 24 C.F.R. § 100.65(a).

91.    Subsection 804(a) of the Act prohibits making a dwelling unavailable because of protected characteristic. 42 U.S.C. § 3604(a); *see also* 24 C.F.R. § 100.50(b)(3). Subsection 804(b) of the Act prohibits discrimination in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with the rental of a dwelling because of a protected characteristic. 42 U.S.C. § 3604(b); *see also* 24 C.F.R. § 100.65(a).

92.    Discrimination under Subsections 804(a) and 804(b) can be proven by considering the following factors: (1) whether the consequences of an action bear more heavily on certain

groups; (2) the historical background of the action; (3) the sequence of events leading up to the action; (4) departures from normal procedural process; (5) departures from normal substantive criteria; and (6) the legislative and administrative history. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). These factors are non-exhaustive and not all must be shown to establish a violation. *See Ave. 6E Invs. LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016); *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016).

93.    HUD made a Determination of Reasonable Cause that Defendants discriminated on the basis of race and set forth factors according to the Supreme Court framework for circumstantial evidence according to the case *Arlington Heights*. Ex. 1 at 37-40. The facts set forth in HUD's Charge and Determination for these factors are incorporated into this Complaint. Ex. 1.

### COUNT TWO: VIOLATION OF SUBSECTION 818 OF THE FHA

94.    MHA re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

95.    Section 818 of the Act prohibits intimidation and harassment because of race or color or because of engagement in activity protected by the Act. 42 U.S.C. § 3617; 24 C.F.R. §§ 100.400(b), (c)(2), (c)(4), 100.600. Third parties can be held liable if they "knew or should have known" of the harassment "had the power to correct it," and failed "to take prompt action." 24 C.F.R § 100.7(a)(1)(iii); *see also* Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the FHA, 81 Fed. Reg. 63054, 63068 (Sep. 14, 2016) (describing a "community association's liability" to act to correct harassing conduct).

96.    As a public housing agency facilitating housing opportunities for low-income residents – many of whom are racial minorities – MHA's activities fall squarely within the ambit of protected conduct. Defendants, by their actions and omissions, knowingly interfered with these efforts, fostering a hostile environment and creating barriers to fair housing based on race and sex.

This interference was not only foreseeable but also avoidable, had Defendants fulfilled their obligations under federal law. FirstService qualifies as a third party under 24 C.F.R. § 100.7(a)(1)(iii) and thus bore a duty to take prompt corrective action once it knew or should have known of the discriminatory conduct. FirstService's failure to act—despite its clear authority to do so—amounts to a violation of its regulatory obligations under 24 C.F.R. §§ 100.400(b), (c)(2), (c)(4), and 100.600. Defendants' inaction and participation in the obstruction of MHA's fair housing efforts constitutes actionable harm under Section 818.

### COUNT THREE: THE RULES BANNING PROGRAM PARTICIPANTS CAUSED A DISPARATE IMPACT ON BLACK PROGRAM PARTICIPANTS

97.     The enacted PHOA Rules banning Program Participants are a change in policy that caused a significant disparate impact on Black Program Participants compared to Whites in violation of the FHA. Prior to the PHOA's ban on vouchers, leasing to Program Participants was permitted and a small percentage of Program Participants leased homes in PHOA. The MHA Program Participants in PHOA were all Black. The policy banning PHOA homeowners from leasing to Program Participants were the Rules enacted by the PHOA in June 2022, which caused the impact to be directed at the Black Program Participants.

98.     While owners/landlords can decide whether to accept or reject voucher holders under both Texas and federal law, Defendants' polices removed that decision from them by creating an artificial, arbitrary, and unnecessary barrier, when less discriminatory alternatives to achieve the goals of minimizing community concerns regarding rising crime rates believed to be caused by Participants.  Namely, the federal regulations governing the HCV Program require criminal background checks and disallow anyone living on the property who has certain criminal convictions or engages in prohibited criminal activity.

99.     Defendants created racial disparity in the homeownership program at Providence

Village. Defendants' enforcement of the Rules and restrictions caused a disproportionate number of Black tenants to face eviction compared to non-Black tenants. The Rules banning leasing to Program Participants caused a statistically significant, adverse disparate impact on Blacks by banning a majority Black group of tenants from leasing in PHOA. The statistical measure of the rejection rate of Black occupied voucher units (92%) compared to White occupied voucher units (5%) greatly exceeds the standard measure for discrimination and is evidence of disparate impact caused by the PHOA ban on vouchers rule. The rejection rate ratio in 2023 is 18.4 which significantly exceeds the 1.25 rejection rate ratio measure for discrimination. *See Rhode Island Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 125-26 (D.R.I. 2015) (finding that a disparity ratio that exceeded 1.25 was sufficient to establish a prima facie case of disparate impact discrimination against families with children). The enacted ban directly and robustly caused the discriminatory effect on Blacks. Defendants diminished the amount of rental opportunities for Black tenants and prospective tenants available before implementation of the Rules.

## COUNT FOUR: PERMANENT INJUNCTIVE RELIEF

100.    MHA re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101.    Defendants, by their acts and omissions, have engaged in unlawful housing discrimination on the basis of race, color, and sex in violation of the Act and have interfered with the rights of MHA.

102.    The following actions have caused and will continue to cause MHA irreparable harm if not permanently enjoined by this Court:

  a.   The operation of the current PHOA rental restrictions,

  b.   The enactment of future rental restrictions that violate the FHA,

  c.   Discriminating because of race or color against any person in the sale or rental

of a dwelling, and

    d. Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, any right granted or protected by the FHA.

103. This Court should further require Defendants to do the following:

    a. Take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future,

    b. Engage in training for PHOA and FirstService officials and employees on how to comply with the FHA and how to prevent future discriminatory housing practices by the PHOA and FirstService,

    c. Take actions to prevent racial hostility, intimidation, threats for Black members of the PHOA, including:

        i. adopting rules that prohibit racial hostility and harassment actions that violate the FHA,

        ii. monitor the unofficial PHOA social media sites that are used by PHOA members and others to monitor for racial hostility and harassment statements that violate the FHA and take appropriate measures to end the use of such hostility and harassment by persons, and

        iii. specific actions upon complaints from PHOA residents concerning racial harassment or intimidation.

104. MHA has no adequate remedy at law. Monetary damages alone cannot compensate for the loss of civil rights, ongoing fear and intimidation, or the destruction of racial integration and community stability.

105. Defendants have acted and will continue to act under the color of law and under the authority of PHOA governance documents to enforce discriminatory and retaliatory measures, unless permanently restrained and enjoined by this Court.

106. The public interest favors the issuance of a permanent injunction to protect the civil rights of residents and to ensure compliance with federal fair housing laws.

## VI.    JURY DEMAND

107.    MHA demands a jury trial on all triable issues triable by a jury.

## VII.    CONCLUSION AND REQUEST FOR RELIEF

Wherefore, MHA respectfully prays for an order and judgment in its favor and against

Defendants for actual damages in the amount to be determined at trial, attorneys' fees and costs,

injunctive relief, and any other relief that the Court deems just and appropriate.

Dated:    May 2, 2025                                    Respectfully submitted,

By:   /s/ Katie Anderson
       Katie Anderson
       State Bar No. 00789631
       KAnderson@CCSB.com
       LaCrecia Perkins
       State Bar No. 24091574
       LPerkins@CCSB.com
       R. Max Ward
       State Bar No. 24137274
       MWard@CCSB.com
       CARRINGTON, COLEMAN,
       SLOMAN & BLUMENTHAL, L.L.P.
       901 Main Street, Suite 550
       Dallas, Texas 75202
       214.855.3000—telephone
       214.580.2641—facsimile

       **ATTORNEYS FOR PLAINTIFF**
       **MCKINNEY HOUSING AUTHORITY**