**IN THE UNITED STATES DISTRICT COURT**
**THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **MCKINNEY HOUSING AUTHORITY,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CASE NO. 4:25-cv-00467** |
| | § | |
| **PROVIDENCE HOMEOWNERS** | § | **JURY TRIAL DEMANDED** |
| **ASSOCIATION, INC. AND** | § | |
| **FIRSTSERVICE RESIDENTIAL** | § | |
| **TEXAS, INC.** | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANTS' JOINT OBJECTIONS AND MOTION TO STRIKE THE EXPERT**
**<u>OPINIONS OF DR. SHANNON VAN ZANDT</u>**

TO THE HONORABLE COURT:

Defendants, FirstService Residential Texas, Inc. ("FirstService") and Providence Homeowners Association, Inc. ("PHOA"), (collectively, "Defendants") respectfully and jointly submit this Objection and Motion to Strike the Expert Opinion of Dr. Sarah Vinson, as follows:

## I.   <u>INTRODUCTION</u>

On December 22, 2025, Plaintiff McKinney Housing Authority ("Plaintiff" or "MHA") disclosed the Expert Report of Dr. Shannon S. Van Zandt ("Report," a true and correct copy of which, excluding the 33-page CV Appendix to the same, is attached to this Motion as Exhibit A). Plaintiffs intend to elicit opinion testimony from Dr. Van Zandt, a Professor of Landscape Architecture and Urban Planning at Texas A&M University, regarding "**the disparate impact** of the Providence Homeowners Association's (PHOA) No Section 8 Housing policy and other rental restrictions on Black Houstin Choice Vouchers (HCV) tenants" (emphasis added). Ex. A, Report, p. 2, § I.

In her Report, Dr. Van Zandt offers the following two (2) opinions:

1. The No Section 8 Housing policy enacted by PHOA and FirstService Residential Texas caused a statistically and practically significant **disparate impact** on Black voucher tenants. ("Opinion 1")

2. The [No Section 8 Housing] policy was a robust cause of the discriminatory effect, resulting in the displacement of existing HCV tenants and the exclusion of future HCV tenants. The policy caused a **disparate impact** on Black tenants by prohibiting current and future leases that allowed HCV tenants. It directly impacted every single voucher lease by making each lease invalid. ("Opinion 2"; and collectively the "Opinions")

*See* Ex. A, Report, p.2, § II, emphasis added. Dr. Van Zandt's deposition was taken in this case on March 27, 2026. A true and correct copy of excerpts from Dr. Van Zandt's deposition testimony in this case ("Depo.") are attached as Exhibit C-1 to this Motion.[1] In sum, Defendants object to and this Court should exclude Dr. Van Zandt's Opinions and testimony in their entirety.

First, Plaintiff's disparate-impact claim against Defendants[2] were dismissed with prejudice in this Court's Memorandum Opinion and Order [Dkt. 53] dated January 5, 2026 ("Order, a copy of which is attached as Exhibit B to this Motion), which granted in part and denied in part Defendants' respective motions to dismiss pursuant to Federal Rule of Procedure 12(b)(6). *See* Dkt. 20, Dkt. 21. Accordingly, Dr. Van Zandt's opinions, both of which pertain to are only in the context of  the very disparate impact claim this Court has already dismissed, are irrelevant and inadmissible. *See* Fed. R. Evid. 401 and 402. Although the Opinions do not purport to address Plaintiff's remaining disparate treatment claims, they are also irrelevant to those claims.

---

[1] *See* Declaration of Roger L McCleary, attached to this Motion as Exhibit C and incorporated herein by reference in its entirety, with Exhibit C-1 to the same, for the limited purposes of this Motion.

[2] *See* Plaintiff's Amended Complaint (Dkt. 16) ("Amended Complaint"), pp. 34 - 36, Count One, Count Two, Count Three, and Count Four. Defendants cite and refer to Plaintiff's Amended Complaint solely for the limited purposes of this Motion and not by way of admission of any kind or nature, which is denied.

Second, to the extent Plaintiffs intend to try to offer Dr. Van Zandt's opinions and testimony for any other purpose, if at all, Defendants would show that Dr. Van Zandt's opinions and testimony are (1) again irrelevant; (2) conclusory; (3) not reliable; (4) not helpful to the jury; and (5) invade the province of the jury and this Court. With Dr. Van Zandt's opinions, Plaintiffs are not attempting to elicit reliable expert testimony from Dr. Van Zandt that will aid in the jury's understanding of the evidence in this case. Instead, through Dr. Van Zandt, Plaintiff tries to cast a simple Providence Village Section 8 voucher holder race ratio as an "expert" opinion and to offer rank conclusions, based only on rank, unreliable, and prejudicial hearsay excerpts from the U.S. Department of Housing's ("HUD") Charge ("Charge") and HUD Final Investigation Report ("FIR") – which Dr. Van Zandt admitted was not under oath and as to which she conducted no independent investigation to verify.

In sum, Dr. Van Zandt's opinions and testimony have no purpose other than to advocate Plaintiff's dismissed disparate impact claims and Plaintiff's argument that Defendants purportedly engaged in disparate treatment, harassment, and retaliation simply because HUD alleged as much in HUD's unproven Charge against Defendants (which the U.S. Justice Department declined to pursue) and HUD's unverified Final Investigation Report ("FIR"). Consequently, Dr. Van Zandt's opinions are not proper expert testimony in this matter. Dr. Van Zandt should be precluded from offering her Opinions and testimony at the trial of this case.

## II. ARGUMENT AND AUTHORITIES

### A. Legal Standards for Expert Testimony

Federal Rule of Evidence 702 provides the following, in relevant part:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

3

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Fed. R. Evid. 702. *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 579-80 (1993).

Under *Daubert*, federal courts are to act as gatekeepers to determine at the outset . . . whether [an] expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 579-80. This gatekeeping function was later extended by the Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999), to apply to non-scientific testimony, requiring that "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"[3]

A court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and may "rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is 'too great an analytical gap between the data and

---

[3] According to the Fifth Circuit, an "expert's testimony must be reliable at each and every step or else it is inadmissible." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). To be reliable, an expert's opinion must bear some indicia of certainty and cannot be conclusory or based on subjective belief. *Pipitone v. Biomatrix, Inc.* 288 F.3d 239, 245 (5th Cir. 2002); *Lewis v. Parish of Terrebonne*, 894 F.2d 142, 146 (5th Cir. 1990) ("An expert's opinion must be preceded by facts in evidence and cannot be the basis of speculation or conjecture."). Moreover, the data underlying an expert's opinion must be independently evaluated when determining whether the opinion is reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999) ("And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question … the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"); *Knight, supra*. (If the data is unreliable, an expert will not be permitted to base his opinion on that data because any opinion drawn from the data is likewise unreliable).

the opinion proffered.'" *Burleson v. Tex. Dep't Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (quoting *Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Opinions that are merely conclusory assertions, unsupported by specific facts, are inadmissible. *Thomas v. Christ Hosp. & Med. Ctr.,* 328 F.3d 890, 894 (7th Cir. 2003); *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416–417 (8th Cir. 2005) (expert's opinion failed to consider relevant facts and was so fundamentally flawed that it was of no assistance to jury).

As the proponent of Dr. Van Zandts' expert testimony, Plaintiffs bear the burden of showing, by a preponderance of the evidence, that Dr. Van Zandt's proffered opinions and testimony are both relevant and reliable. Fed. R. Evid. 104(a), 401, and 402; *Daubert*, 509 U.S. at 592, n.10.[4]

**B.  Dr. Van Zandt's Opinions are Not Relevant.**

Plaintiffs intend to offer expert testimony from Dr. Van Zandt regarding "**the disparate impact** of the Providence Homeowners Association's (PHOA) No Section 8 Housing policy and other rental restrictions on Black Houstin Choice Vouchers (HCV) tenants" (emphasis added). Ex. A, Report, p. 2, § I.

Dr. Van Zandt's admits that her Opinions are the only opinions that she has reached and that she expects to offer or is prepared to offer at trial in this lawsuit. Ex. C-1, Depo., p. 46/l. 20 – p. 47/l. 2; Ex. A, Report, p.1, § II, emphasis added. However, Plaintiff's disparate-impact claims

---

[4] A court should also exclude irrelevant opinion testimony. Fed. R. Evid. 401, 402, 702. To be relevant, the opinion must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert,* 509 U.S. at 591. Also, Fed. R. Evid. Rule 403 permits a district court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentative of cumulative evidence."

against Defendants[5] were dismissed with prejudice in this Court's Order [Dkt. 53]. Ex. B. Accordingly, Dr. Van Zandt's Opinions, both of which pertain to and are only in the context of the very disparate impact claims this Court has already dismissed, are irrelevant and inadmissible. *See* Fed. R. Evid. 401 and 402.[6]

**C. Dr. Van Zandt's Opinions and Testimony Relating to Purported Application of Texas Law and the Disparity Ratio Should Be Excluded.**

In her Report, Dr. Van Zandt has calculated a so-called "disparity ratio." Ex. A, Report, p. 5, § III. A. The "disparity ratio" was to "assess the possible disparate impact of the No Section 8 policy on Black voucher tenants . . . ." *Id*. Dr. Van Zandt calculated this "disparity ratio" to be 15.2, as follows, in pertinent part:

> According to the HUD FIR, at the time the No Section 8 ban was passed, 165 PHOA units were leased to voucher tenants, 153 of which were Black and 10 of which were Non-Hispanic White. HUD FIR, p. 56. Thus the percentage of Black voucher tenants whose leases were terminated was 92.7% (calculated by dividing 153 by 165) and the percentage of Non-Hispanic White voucher tenants affected by the policy was 6.1% (calculated by dividing 10 by 165). . . . dividing 92.7 by 6.1 results in a Disparity Ratio of 15.2. . . .

*Id*.; Ex. C-1, Depo., p. 89/l. 3 – l. 21. Based only on this simplistic first "disparity ratio" calculation, Dr. Van Zandt concluded "[t]hus, I find that **differences between the Black and Non-Hispanic White populations, including the subset of the population represented by the MHA, are both statistically and meaningfully different. I conclude that the No Section 8 policy passed and implemented by the Defendants caused a disparate impact, harming Black tenants.**." Ex. A, Report, p. 5, § III. A.

---

[5] *See* Plaintiff's Amended Complaint, pp. 34 - 36, Count One, Count Two, Count Three, and Count Four.

[6] Although the Opinions do not purport to address Plaintiff's remaining disparate treatment claims, they are also irrelevant to those claims.

Dr. Van Zandt's Report contends that "The disparity ratio **is used as evidence here because it aligns with legal requirements to demonstrate that a policy has a meaningful and disproportionate adverse effect on a protected group compared to others.**" Ex. A, Report, p. 3, § III., first sentence, fourth full paragraph (emphasis added). However, Dr. Van Zandt does not have a law degree or any legal education or training. Ex. C-1, Depo., p. 31/l. 23 – p. 31//l. 25.  Dr. Van Zandt does not hold herself out as a legal expert or an expert on the application of the law to cases. Ex. C-1, Depo., p. 32/l. 1 – p. 32//l. 4; p. 32/l. 18 – p. 32/l. 21.

Also, Dr. Van Zandt's so-called "disparity ratio" amounts to nothing more than recognitions of the obvious, simple, coincidental, and undisputed math that there were 15.2 times more Black than non-Hispanic White HCV holders at the time the "No Section 8 ban" was passed. The ratios of Blacks to non-Black HCV holders would be easily determined by and understandable to a trier of fact. Dr. Van Zandt's Opinions and her related testimony are not only irrelevant, but they also do not require specialized or scientific knowledge, they are not helpful to the trier of fact, they are calculated to confuse and mislead a jury, and they would invade the province of the jury - and this Court as arbiter of the law in this case. *See* Fed. R. Evid. 401, 402, 403; *Daubert* 509 U.S. at 592-93.[7] Also, Dr. Van Zandt also admitted the following in her deposition testimony:

1. The "disparity ratios" are the basis for her Opinions (see Ex. C-1, Depo., p. 89/l. 3 – l. 21, p. 91/l. 20 – p. 93/l. 22);

2. That Dr. Van Zandt has no information indicating and she does not contend that there is any area that is predominantly White, Black, or other minority rental area within Providence Village (*see* Ex. C-1, Depo., p. 70/l. 18 – p. 80/l. 12);

---

[7] Furthermore, even with respect to disparate-impact claims (which have been dismissed here), the U. S. Supreme Court has cautioned that "disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based solely on a showing of a statistical disparity.'" *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015).

3. That the rental rules at issue, including the "No Section 8 Housing" policy or the "No Section 8" restriction applied to all residents, renters, potential renters in Providence Village regardless of their race, color, or national origin (*see* Ex. C-1, Depo., p. 70/l. 8 – l. 17);

4. That not all Black residents of Providence Village, if they were adversely impacted at all, were adversely impacted by the rental rules, including the "No Section 8 Housing" policy *(see* Ex. C-1, Depo., p. 71/l. 13 – p. 72/l. 1);

5. That white HCV holders were not impacted, if at all, less harshly than Black or other minority HCV holders (*see* Ex. C-1, Depo., p. 72/l. 2 – l. 8);

6. That 153 of 165 HCV holders that were Black before the rental rules, including the "No Section 8" ban were passed, so the "No Section 8" ban had nothing to do with the fact that those were the numbers. In other words, the "No Section 8 Housing" ban it didn't cause those to be the numbers in any way because those were the numbers already: 153 of 165 HCV holders were Black (*see* Ex. C-1, Depo., p. 74/l. 25 – p. 75./l. 20). None of the rental rules at issue, including the "No Section 8" policy produced the ratio of Blacks to whites that existed in Providence Village as of the time those rules were passed *(see* Ex. C-1, Depo., p. 99/l.20 – p. 100/l. 3, p. 100/l. 22 – p. 101/l. 8);

7. That none of the data cited by Dr. Van Zandt supports any position, if any, that that the "No Section 8 Housing" policy or any of the other rental rules at issue caused Black persons be the dominant groups of housing voucher holders in Providence Village (*see* Ex. C-1, Depo., p. 75/l. 22 – p. 76/l. 10);

8. Dr. Van Zandt does not dispute that the Defendants bear no responsibility for the geographic distribution of Blacks and other minorities throughout the Providence Village area prior to and at the time of the implementation of the "No vouchers" policy or any other rental rules at issue (*see* Ex. C-1, Depo., p. 76/l. 11 – l. 18);

9. Dr. Van Zandt has not done any independent investigation as to why any of the HCV holders who moved out of Providence Village moved, even though she recognizes there can be a variety of reasons why people move, including losing their job, finding a better job opportunity, or maybe a cheaper place to which to move (*see* Ex. C-1, Depo., p. 77/l. 16 – p.78/l. 9);

10. Dr. Van Zandt knows that none of the interviews included or referenced in the HUD FIR or the HUD Charge were under oath and she is not aware of HUD undertaking any effort to validate or investigate the statements made by voucher holders or other witnesses included within the HUD FIR or the HUD Charge (*see* Ex. C-1, Depo., p. 111/l. 16  – p. 112//l. 3);

8

11. Although Dr. Van Zandt made the assumption that all leases to Section 8 households were "terminated" when the rental rules purportedly "went into effect," she admitted that she did not know if all of the leases were actually terminated by the landlords or how many were terminated (*see* Ex. C-1, Depo., p. 88/l. 2 – p.89/l. 2); and,

12. Dr. Van Zandt was provided only with excerpts from the HUD FIR and she has not reviewed the entire HUD FIR (*see* Ex. C-1, Depo., p. 114/l. 9 – l. 15; Ex. A, Report, p. 7, § IX., third bullet point).

Dr. Van Zandt has conceded that event the HUD FIR materials she actually received and reviewed were incomplete. Ex. C-1, Depo., p. 114/l. 9 – l. 15; Ex. A, Report, p. 8, § IV., third bullet point. She was spoon-fed information by Plaintiff's counsel, and thus focused only on what Plaintiff's counsel asked her to consider, while ignoring a wealth of other evidence. *Id*. This is hardly a reliable methodology under Federal Rule of Evidence 703. Accordingly, to the extent Plaintiffs and Dr. Van Zandt attempt to extrapolate from these "disparity ratios" or to otherwise offer testimony from Dr. Van Zandt in support of Plaintiff's claims, Defendants object that this, too, would not be helpful to the trier of fact, it would be calculated to confuse and mislead a jury, it would not be based on sufficient facts or data, it would not be a product of reliable principles and methods or reliable application to the facts of this case, and (to the extent Dr. Van Zandt may attempt to offer any argument that her Opinions or related testimony are purportedly supported by or consistent with the law) it amounts to an effort by an unqualified expert to invade the province of this Court as arbiter of the law. *See* Fed. R. Evid. 401, 402, 403; *Daubert*, 509 U.S. at 592-93.

**D. Defendants Object that Dr. Van Zandt's So-Called "Robust Causation" Observations are Inadmissible.**

In essence, Dr. Van Zandt did one simple ratio calculation on which her Opinions were based. Anything else Plaintiffs may attempt to solicit from Dr. Van Zandt, if anything, would be beyond the scope of her opinions and amount to nothing more than unreliable and unhelpful parroting of the unreliable HUD FIR or the HUD Charge. *See* Fed. R. Evid. 401, 402, 403; Fed.

9

R. Evid. 702, Adv. Comm. Notes (2000); *Daubert*, 509 U.S. at 592-93; *Guillory v. Domtar Indus. Inc*., 95 F.3d 1320, 1331 (5th Cir. 1996); *Joiner*, 522 U.S. at 146.

On pages 5 – 8 of her report, Dr. Van Zandt "examine[d] whether the statistical disparities—including the magnitude of disparity ratios—and rental-market effects associated with the policy at issue are sufficiently substantial to support an inference that the policy itself caused the adverse outcomes for the protected class," purportedly in the context of the robust causation standard under *Inclusive Communities Project v. Lincoln Property Co*., 920 F.3d 890 (5th Cir. 2019). (*See* Ex. 1 Report, pp. 5 – 8) and in support of her Second Opinion.

First, once again, Plaintiff's disparate-impact claims against Defendants were dismissed with prejudice in this Court's Order [Dkt. 53]. Accordingly, Dr. Van Zandt's Second Opinion, which pertains to and is only in the context of Plaintiff's dismissed disparate impact claims, and any purported robust causation "examination" in an attempt to support Dr. Van Zandt's Second Opinion, is irrelevant and inadmissible. *See* Fed. R. Evid. 401 and 402.

Second, Dr. Van Zandt is not qualified to interpret or apply *Inclusive Communities Project v. Lincoln Property Co*., 920 F.3d 890 (5th Cir. 2019) to this case or the facts of this case. Again, she does not have a law degree or any legal education or training.  (*See* Ex. C-1, Depo., p. 31/l. 23 – p. 31//l. 25). Nor does Dr. Van Zandt hold herself out as a legal expert or an expert on the application of the law to cases. *See* Ex. C-1, Depo., p. 32/l. 1 – p. 32//l. 4; p. 32/l. 18 – p. 32/l. 21.

Third, Dr. Van Zandt's "examination" amounts to no more than an attempt to offer a legal conclusion on "robust causation" that is unhelpful to the trier of fact and invades the province of the jury - and the Court as arbiter of the law. Fed. R. Evid. 702; *Nichols,* 154 F.3d at 883; *Andrews,* 882 F.2d at 708; *Gonzalez–Maldonado,* 115 F.3d at 15. Dr. Van Zandt's "robust causation" observations and conclusions, at best, invade the function of the jury and – and this Court – and amount to pure speculation. As *Wegner et al*. advise, "[n]ot only is expert testimony unhelpful in such circumstances, but it may also risk unfair prejudice to the opposing party, confuse the issues or mislead the jury. 'By appearing to put the expert's stamp of approval on (a) theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged.'" *Wegner et al*., Rutter Group Prac. Guide Fed. Civ. Trials & Ev., Ch. 8F-C, quoting *Gonzalez–*

*Maldonado*, *supra*, 115 F.3d at 17-18 (parentheses added) (whether participants in recorded conversation "appeared relieved").

Fourth, Dr. Van Zandt's "examination" is conclusory and unreliable. The Report states that "The Record that includes the HUD Charge and HUD FIR states the following facts that correspond directly to this causation test . . . " *See* Ex. 1, Report, p. 6, § III. C, last full sentence. In essence, Dr. Van Zandt's "robust causation" observations and conclusions essentially parrot allegations and information from HUD's unsworn, unverified Charge and FIR. *See* Ex. C-1, Depo., p. 93/l. 23  – p. 96/l. 5; p. 101/l. 9 – p. 103/l. 6, p. 103/l. 19 – p. 106/l. 6, p. 111/l. 16  – p. 112//l. 3; Ex. A, Report, citations to HUD FIR and HUD Charge and p. 6, § III. C, last full sentence.

Moreover, Dr. Van Zandt did not consider the "broader market factors" to which she refers under the Report heading "1. Identifiable Policy Change Affecting the Rental Market," but she instead, in a blithe and conclusory manner, sweeps them aside. *See* Ex. 1, Report, p. 6, § III. C. I. Again, Dr. Van Zandt admitted that she has not done any independent investigation as to why any of the HCV holders who moved out of Providence Village moved, even though she recognizes there can be a variety of reasons why people move, including losing their job, finding a better job opportunity, or maybe a cheaper place to which to move. Ex. C-1, Depo., p. 77/l. 16 – p.78/l. 9. Dr. Van Zandt also contends that the "challenged rules had immediate operational force . . . ." *Id*. But she admittedly had no opinions that PHOA FirstService or its employees enforced any of the rental rules passed by PHOA's Board of Directors, including the "No Section 8 Housing" policy. Ex. C-1, Depo., p. 59/l. 23 – p. 60//l. 11. Also, although Dr. Van Zandt made the assumption that all leases to Section 8 households were "terminated" when the rental rules purportedly "went into effect," she admitted that she did not know if all of the leases were actually terminated by the landlords or how many were terminated. *See* Ex. C-1, Depo., p. 88/l. 2 – p.89/l. 2.

Under the heading "2. Clear, Quantifiable Reduction in Housing Opportunities" Dr. Van Zandt contends that there was a "removal of this entire set of units from the available housing pool." Ex. 1, Report, p. 6, § III. C. 2. But this is incorrect; unsupported, and (as noted in the preceding paragraph) Dr. Van Zant has admitted that she did not know if all of the leases were

actually terminated by the landlords or how many were terminated. *See* Ex. C-1, Depo., p. 88/l. 2 – p.89/l. 2.

Under the heading "3. Statistical Disparities Tied to a Protected Class," Dr. Van Zandt refers to her simplistic "disparity ratios," incorrectly asserts that "the policy eliminated all voucher tenancies at once" (*see* Ex. C-1, Depo., p. 59/l. 23 – p. 60//l. 11,  p. 88/l. 2 – p.89/l. 2), and concludes that "**The disparity ratios** are sufficiently large, stable, and derived from full-population counts to support the inference, under the *Lincoln* test, that the policy itself, rather than chance or background market conditions, produced the observed racial and gender patterns." Ex. 1, Report, p. 6, § III. C. 3. Dr. Van Zandt's leap from the simplistic "disparity ratios" to such an "inference," under a "*Lincoln* test" she is unqualified to apply (*see* Ex. C-1, Depo., p. 31/l. 23 – p. 31//l. 25; p. 32/l. 1 – p. 32//l. 4; p. 32/l. 18 – p. 32/l. 21), is conclusory and not supported by any sufficient or reliable methodology or information. It should not be admitted. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-93.

Under the heading "4. Direct Causal Pathway Between the Policy and the Harms Experienced," Dr. Van Zandt parrots purported HUD "findings" of what the No Section 8 policy allegedly "caused' landlords to do (*e.g.*, issue nonrenewals, refuse renewal options, shorten least terms, *etc*.), and purported impacts on tenants (*e.g.,* sudden relocation, *etc*.). Ex. 1, Report, p. 7, § III. C. 4. Based on this, Dr. Van Zandt concludes the following:

> From a causation perspective, these effects are consistent with a policy that instantaneously eliminates all authorized voucher housing. Neither the HUD Charge nor the FIR attribute these outcomes to neighborhood economic trends or regional rental pressures; rather, it alleges a linear causal chain beginning with the PHOA rule and ending with the forced displacement of voucher families.

*Id*. This conclusory causal link by Dr. Van Zandt amounts to an attempt by Plaintiffs to confuse the trier of fact and blur the causal burden that Plaintiff's carry. It is unhelpful to the trier of fact, unreliable and not based on reliable facts or data, and Dr. Van Zandt is not qualified to sponsor it. Fed. R. Evid. 702; *Daubert*, *supra.*; *see also*, Ex. C-1, Depo., p. 31/l. 23 – p. 31//l. 25; p. 32/l. 1 – p. 32//l. 4; p. 32/l. 18 – p. 32/l. 21. In her Report, Dr. Van Zandt refers to the purported effects

12

experienced by tenants (*see* Ex. 1, Report, p. 7, § III. C. 4), though she admitted in her deposition that it was not sworn or verified to Dr. Van Zandt's knowledge, she did no independent investigation into whether landlords actually did these things, she cannot validate what is included in the FIR, and she cannot quantify how many landlords may have done these things, or why, or how many tenants actually experienced any of the purported effects of the rules at issue. *See* Ex. C-1, Depo., p. 101/l. 9 – p. 103/l. 6, p. 103/l. 19 – p. 106/l. 6, p. 111/l. 16  – p. 112//l. 3.

Under the heading "5. *Absence of Alternative Explanations that Could Account for the Disparities*," Dr. Van Zandt once again offers unreliable conclusions based on inferential leaps from the unreliable HUD Charge. Ex. 1, Report, p. 7, § III. C. 5.

Under the heading "6. *Community Conditions That Intensified the Policy's Effects*," Dr. Van Zandt once again parrots the HUD Charge and FIR when she states "HUD finds and provides evidence that social media-based hostility, directed disproportionately at Black residents and voucher tenants, heightened pressures to move, made families feel unsafe, and contributed to rushed or destabilizing relocations." Ex. 1, Report, p. 7, § III. C. 6. Based on this, Dr. Van Zandt claims that, "[i]n the *Lincoln* framework, this type of community environment does not replace the policy as the causal factor; instead, it provides additional context showing how the policy operated in real-world conditions and why its effects were both swift and severe." *Id*. Here again, Dr. Van Zandt's conclusory "analysis" is unhelpful and unreliable. It implicitly and prejudicially suggests that the Defendants are somehow responsible for such "media-based hostility," notwithstanding Dr. Van Zandt's deposition admission that she is not going to testify and does not have any opinions that PHOA or FirstService or any of its employees made or endorsed any racist remarks made on any social media. *See* Ex. C-1, Depo., p. 58/l. 24 – p. 59/l. 12, p. 107/l. 24 – p. 108/l. 23, p. 109/l. 19 – p. 110/l. 9).

13

Finally, under the heading "*7. Overall Causal Inference Supported by the HUD Charge and FIR*," Dr. Van Zandt once again relies on the HUD Charge and FIR as purportedly outlining a "causal structure, consistent with the *Lincoln* test." (*See* Ex. 1, Report, p. 8, § III. C. 7). This, too, is conclusory, unreliable and not supported by reliable facts, unhelpful, and unqualified. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-93 (1993); *see also*, Ex. C-1, Depo., p. 31/l. 23 – p. 31//l. 25; p. 32/l. 1 – p. 32//l. 4; p. 32/l. 18 – p. 32/l. 21.

Permitting Dr. Van Zandt to testify regarding what amounts to conclusory speculation regarding purported robust causation, including what landlords may (or admittedly may not) have done and what tenants may (or admittedly may not) have experienced, if anything, in the aftermath of passage of the rules at issue would be improper and prejudicial. The Fifth Circuit, in *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230 (5th Cir. 1986), denounced the admission of speculative expert testimony based on the rationalization that it is for the jury to determine the weight to which the testimony is entitled.

## III.   CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Defendants, FirstService Residential Texas, Inc., and Providence Homeowners Association, Inc., pray that their objections and this Motion be granted, that the opinions and testimony of Plaintiff's expert witness, Dr. Shannon Van Zandt, be stricken and excluded, and that Dr. Van Zandt be prevented from providing any testimony or opinions to be used on a motion, at a hearing, or at trial, in this lawsuit, and further request all other relief, either at law or in equity, to which they may be justly entitled.

Respectfully submitted,

By: /s/ *Roger L. McCleary*
    Roger L. McCleary (SBOT: 13393700) rmccleary@pmmlaw.com
    James C. Burnett (SBOT: 24094025)

14

jburnett@pmmlaw.com
Parsons McEntire McCleary PLLC
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Telephone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR DEFENDANT
FIRST SERVICE RESIDENTIAL
TEXAS, INC.**

By: */s/David A. Talbot*_____

Sarah R. Smith
*Attorney-In-Charge*
Texas State Bar No. 24056346
Email: Sarah.Smith@dinsmore.com
David A. Talbot
Texas State Bar No. 24037580
Email: David.Talbot@dinsmore.com
JPMorgan Chase Tower
600 Travis St., Suite 7350
Houston, Texas 77002
Telephone: 346-293-7878
Facsimile: 346-293-7877

**ATTORNEYS FOR DEFENDANT
PROVIDENCE HOMEOWNERS
ASSOCIATION, INC.**

**\* Signed by permission**

## CERTIFICATE OF CONFERENCE

I certify that on April 6, 2026, I conferred with opposing counsel by email and phone today regarding this motion, and they are opposed.

*/s/ James C. Burnett*_____
James C. Burnett

15

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 6, 2026, I electronically filed and served this document with the Clerk of the U.S. District Court for the Eastern District of Texas using the electronic case filing system upon all other parties.

*/s/ Roger L. McCleary*
Roger L. McCleary

3225145.1

16